George VANLEEUWEN, Herbert C. Coleman, William A. Kessi, Ed Ammon, and Fred Kaser, Plaintiffs,

v.

The FARM CREDIT ADMINISTRATION; Donald J. Wilkinson; the Federal Intermediate Credit Bank of Spokane, Washington; Larry K. Butterfield; Twelfth Farm Credit District; and Ronald Bokma, Defendants.

Civ. No. 83–1413–PA.

United States District Court, D. Oregon.

Dec. 28, 1984.

**1174**

William D. Brandt, Ferder, Ogdahl & Brandt, Salem, Or., Henry A. Carey, Henry A. Carey, P.C., Portland, Or., for plaintiffs.

Clifford N. Carlsen, Jr., R. Alan Wright, Richard A. Edwards, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for defendants The Federal Intermediate Credit Bank of Spokane, Wash., Larry K. Butterfield, Twelfth Farm Credit Dist., and Ronald Bokma.

Charles H. Turner, U.S. Atty., Jack G. Collins, Asst. U.S. Atty., Portland, Or., Richard K. Willard, Acting Asst. Atty. Gen., Sandra M. Schraibman, Stanley Dalton Wright, Wendy B. Kloner, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants The Farm Credit Ass'n and Donald J. Wilkinson.

PANNER, Chief Judge.

Plaintiffs are five shareholders and former directors of the Willamette Production Credit Association (WPCA). Defendants are The Farm Credit Association (FCA); its Governor, Donald J. Wilkinson; The Federal Intermediate Credit Bank of Spokane, Washington (FICB); its President, Larry K. Butterfield; the Twelfth Farm Credit District; and the Chairman of its Board, Ronald Bokma. Plaintiffs' initial complaint alleged that the FCA improperly devalued security on loans and charged off assets when performing a special audit of the WPCA's books. On October 5, 1983, I restrained defendants from appointing a receiver for the WPCA and from beginning its liquidation. On October 26, 1983, I granted a preliminary injunction which declared the FCA's June 30, 1983, special audit to be null and void, set aside the August 10, 1983, order of the FCA governor, enjoined defendants from soliciting or assisting any WPCA borrower to transfer to the Central Oregon Production Credit Association, and restored the status quo of the WPCA to what it was as of August 9, 1983. This restoration included reinstatement of plaintiffs as WPCA directors, reinstatement of the WPCA's bylaws, and

withdrawal of a finding of impairment of the WPCA's stock. *See generally Van-Leeuwen v. The Farm Credit Assoc.*, 577 F.Supp. 264 (D.Or.1983).

On May 15, 1984, I dismissed this action with prejudice based on a stipulated agreement. *See* Appendix I, Stipulation and Agreement of Dismissal. The parties agreed that the WPCA was in default and insolvent. They further agreed that, based on an adequate second examination of the WPCA, the FCA had the authority to place the WPCA into involuntary liquidation. The WPCA requested the FCA approve the board's March 8, 1984, resolution except for item 2 and place the WPCA in voluntary liquidation in accord with that resolution. The FCA agreed to approve the charter of a new production credit association in accordance with the terms of a May 4, 1984, letter of Governor Wilkinson. The parties agreed to a dismissal with prejudice.

On December 5, 1984, *nunc pro tunc*, as of November 29, 1984 at 8:30 A.M., I granted plaintiff's motion to set aside the judgment pursuant to Fed.R.Civ.P. 60(b)(6) for the purpose of determining, through an evidentiary hearing, whether the defendants violated the settlement agreement as alleged by plaintiffs. 600 F.Supp. 1161. I also issued a temporary restraining order (TRO) enjoining any further effort toward the liquidation of the WPCA and litigation proceeding in the Circuit Court for the State of Oregon (*Willamette Production Credit Assoc., et al. v. Kaser,* Civil No. 84–7–98). I renewed this TRO on December 11, 1984. On December 21, 1984, I issued a preliminary injunction enjoining any further steps in the liquidation of the WPCA pending issuance of this more formal decision. I also denied defendants' motions for a stay pending appeal and the posting of a bond by plaintiffs.

For the reasons stated below, I find the defendants have not violated the settlement agreement, and I reinstate the initial judgment of dismissal with prejudice. The preliminary injunction issued on December 21, 1984, is dissolved effective Wednesday, January 2, 1985, at 5:00 P.M.

## THE BOARD RESOLUTION OF MARCH 8, 1984

It is necessary first to determine whether or not the March 8, 1984 WPCA Resolution is part of the settlement agreement. Title 12 U.S.C. § 2183(a) provides, in part:

> No institution of the System shall go into voluntary liquidation without the consent of the FCA and with such consent may liquidate only in accordance with regulations prescribed by the FCA.

The only regulation promulgated by the FCA dealing with liquidation is 12 C.F.R. § 611.1130 which states, in part:

> [T]he board of directors of an association, *by the adoption of an appropriate resolution,* may place an association in voluntary liquidation, subject to approval of the bank board and the FCA....

(Emphasis added).

The statute states that the only way for a production credit association (PCA) to voluntarily liquidate is in accordance with the FCA regulations. The only regulation dealing with liquidation states that the procedure for voluntary liquidation must be by a resolution of the board of the PCA. The statute and the regulation require a board resolution as part of any agreement to voluntarily liquidate a PCA.

The March 8, 1984 Resolution adopted by the WPCA Board pursuant to 12 C.F.R. § 1130 states that it will voluntarily liquidate the WPCA subject to a number of conditions. This Resolution makes it clear that any agreement by the WPCA to voluntarily liquidate was specifically conditioned upon the acceptance of these conditions by the FICB and the FCA.

The settlement agreement filed with the court in this case states, in part:

> [T]he board of directors of the WPCA has requested the Governor of the Farm Credit Administration to approve the board's resolution to place the WPCA in voluntary liquidation *in accord with the*

*terms of said resolution,* with the exception of Item # 2 thereof....

(Appendix I, at pp. 4–5, emphasis added.) In a May 4, 1984 letter from Governor Wilkinson filed as part of the settlement agreement, he stated: "In connection with the dismissal, FCA will approve the action of the board to place the Willamette PCA in voluntary liquidation." (Appendix I at p. 12.)

The plain meaning of the statute, regulation, and settlement agreement show that:

(1) A voluntary liquidation of a PCA can only proceed after adoption of an appropriate resolution by the PCA's board;

(2) The appropriate WPCA resolution contained certain conditions which had to be met before the WPCA would agree to voluntary liquidation;

(3) The May 4, 1984 letter of the Governor approved the board's action, thereby approving the conditions of voluntary liquidation as well as the fact of voluntary liquidation itself;

(4) The settlement agreement states that any approval of the liquidation by the Governor must be in accord with the terms of the March 8, 1984 Resolution; and

(5) The board's resolution was attached to the stipulated settlement.

If the Governor was unwilling to accept the board's conditions, he had the option to reject them and either obtain a new resolution for voluntary liquidation or act under subparagraph (b) of section 2183 to effect an involuntary liquidation.

The board resolution is part of the settlement agreement.

## DISCUSSION

The violations of the settlement agreement alleged by plaintiffs in their motion to set aside the judgment were:

(1) Lack of properly promulgated regulations;

(2) A "fire-sale" approach to liquidation caused, in part, by a lack of properly promulgated regulations;

(3) Filing an action against plaintiffs in state court;

(4) Violation of the court's protective order of May 10;

(5) Failure to provide required reports;

(6) Fraudulent representations about Class Two loans; and

(7) Defendants' intention never to form a viable PCA and secret plan to centralize.

## I. *Lack of Properly Promulgated Regulations.*

■ The language of the statute authorizing voluntary liquidation of a PCA allows liquidation to occur *only* in accordance with FCA regulations. 12 U.S.C. § 2183(a). This statutory language clearly contemplates that the FCA must enact regulations governing liquidation and the FCA has conceded this at the preliminary injunction hearing. The one FCA regulation dealing with liquidation is 12 C.F.R. § 611.1130, *supra.* This regulation essentially restates the statute and allows an association to go into voluntary liquidation, subject to approval of the bank board and the FCA. It does not supply the essential procedures and substantive standards necessary to comply with the statutory mandate. *See Curry v. Block,* 738 F.2d 1556 (11th Cir. 1984) (Consolidated Farm and Rural Development Act created a right to uniform procedures and substantive standards so agency mandated to adopt regulations); *United States v. Markgraf,* 736 F.2d 1179 (7th Cir.1984); and *Matzke v. Block,* 732 F.2d 799 (10th Cir.1984). There is a serious question about whether the FCA can liquidate a PCA without having properly promulgated regulations. This lack of regulations may be posing hardships to the individual farmers whose loans are being foreclosed. The question before me, however, is whether the settlement agreement was procured by fraud or violated so as to justify setting aside the stipulation and the judgment of dismissal.

The settlement agreement states that the liquidation of the WPCA will be pursuant to section 1130 of the Farm Credit Regula-

tions. (Appendix I at p. 4.) Plaintiffs agreed to the liquidation pursuant to this one regulation. The agreement does not require further regulations prior to the WPCA liquidation. The evidence shows that plaintiffs were aware of the existence of the Southern Idaho PCA Liquidation Plan when they signed the agreement and agreed to voluntary liquidation following the pattern established in that liquidation. (*See* Statement of Board of Directors Leading to Voluntary Liquidation at p. 3, Addendum to WPCA Board Meeting Minutes of March 8, 1984).

Although lack of any properly promulgated regulations governing the liquidation procedures for PCAs appears to violate the statute, it does not violate the settlement entered into by plaintiffs and cannot provide a basis for setting aside the judgment based on that agreement.

## II. *Alleged "Fire-Sale" Approach to Liquidation.*

■ One of the major objectives of the liquidation stated in the settlement agreement was to safeguard against a "fire-sale" approach to liquidation. (Appendix I at p. 5.) A lack of properly promulgated regulations could only violate the settlement agreement by causing a "fire-sale" approach to liquidation. I find there has not been a "fire-sale" approach to the WPCA liquidation.

On May 21, 1984, when the receiver took over operation of the WPCA, thirty loans were in foreclosure or bankruptcy proceedings. Since that date there have been eight new foreclosure or bankruptcies. (*See* FICB Defendants' Memorandum Concerning Preliminary Injunction filed Dec. 7, 1984.) Plaintiffs cite to only one instance where they allege such an approach. (*See* Affidavit of Philip Brandt.) This volume of foreclosure or bankruptcy does not establish a "fire-sale" approach to liquidation.

## III. *Filing an Action Against Plaintiffs in State Court.*

■ The settlement agreement states that each of the parties will pay its own attorneys' fees. (Appendix I at p. 6.) Plaintiffs argue that the WPCA was the real party to this agreement and that a resolution passed by the board to pay plaintiffs' attorneys' fees for this litigation was approved by this agreement. Defendants argue that the individual plaintiffs were responsible for their own fees and have filed suit in state court to recover these fees. There is a factual issue to be determined by the state court. Such a good faith dispute is not a basis for setting aside the judgment in the present case. *See Strama v. Peterson*, 96 F.R.D. 198 (N.D. Ill.1982) (Fed.R.Civ.P. 60(b) motion denied, in part, because breach of settlement contested), and *United States v. National Bank and Trust Co.*, 101 F.R.D. 770 (N.D. Ill.1984) (Fed.R.Civ.P. 60 motion should be denied if it is more appropriate for a separate action to be filed).

## IV. *Alleged Violation of the May 10, 1984 Protective Order.*

■ The protective order is not a part of the settlement agreement. Violation, if there was one, does not justify setting aside the judgment. *See American National Bank, supra* at 771 (Fed.R.Civ.P. 60 motion not appropriate to enforce an accord which was not part of a settlement agreement).

## V. *Failure to Provide Required Reports.*

■ The settlement agreement requires the liquidating agent to provide the WPCA board with regular reports relating to the progress of the liquidation. (Appendix I at p. 5.) Plaintiffs allege that the WPCA board members were never supplied with these regular reports. Some, but not regular, reports were provided. On May 16, 1984, the day after the order dismissing this case was filed, the WPCA board voted to file a new lawsuit (*Coleman, et al. v. FICB, et al.*, Civil No. 84–6215E–PA) against many of the defendants in the present case. (*See* WPCA Board of Directors Meeting Minutes, May 16, 1984 at p. 4, FICB Defendants Exhibit 301.) Plaintiffs immediately set up an adversarial re-

lationship with many of the defendants. Failure to provide plaintiffs with regular liquidation reports under such circumstances is not a basis for setting aside the judgment.

### VI. *Fraudulent Representations About Class Two Loans.*

■ The agreement states that the liquidating agent will sell all of the WPCA's Class One and Two agricultural loans to the newly chartered PCA subject to its approval. (Appendix I at p. 5.) Plaintiffs allege that nearly all Class Two loans are being returned to the liquidator, reducing the new PCA's loan volume, and making it harder for the new Western Oregon Production Credit Association (WOPCA) to survive. I find that there has been no fraud in the offering of these loans to the WOPCA and no undue pressure on the new WOPCA board to force them not to accept these loans. All the loans required to be offered to the WOPCA have been offered to it. The directors of WOPCA have made the decision as to which loans to return.

### VII. *Allegations That Defendants Never Intended to Form a Viable PCA and That Defendants Have a Secret Plan to Centralize the PCAs.*

■ The settlement agreement provides that a new PCA will be formed to serve the same territory as the WPCA and that the FCA Governor will repeal his action including the territory served by the WPCA in the territory served by the Central Oregon Production Credit Association (COPCA). (Appendix I at pp. 4–5.) This was done. Plaintiffs allege that defendants have a secret plan to merge the PCAs and to make the new PCA fail. I do not find these allegations to be supported by the evidence.

Governor Wilkinson's May 4, 1984 letter to WOPCA incorporators noted that he believed the proposed WOPCA offered significant disadvantages over an earlier plan to merge the WPCA's territory with the COPCA. (Appendix I at p. 8.) Plaintiffs were

on notice that the FCA had reservations about the viability of the new WOPCA at the time of the settlement. These reservations, without more, do not show intent by the FCA not to form a viable PCA or to centralize the PCAs.

The minutes of the May 7, 1984 meeting of the WPCA board also show significant knowledge of the terms of the settlement agreement and of the new WOPCA board. (FICB Defendants' Exhibit 301.) Present at this meeting were Bill Hoffman, Associate Deputy Governor of the FCA, and Steven C. Hilts, Financial Supervisory Officer of the FCA. The plaintiffs learned at that meeting that Gerald Wharton would be the WPCA liquidator. Tom Brown stated that a $1,000,000 capital infusion would be made into the new PCA. The WOPCA incorporators were also present so WPCA board members knew who they would be and who would nominate the WOPCA's board of directors. With this knowledge, the plaintiffs entered into the settlement agreement.

The May 16, 1984 Minutes of the WPCA (FICB Defendants Exhibit 302) recognize that the WPCA was insolvent and not viable. They knew WOPCA would have a difficult time. Hopefully, it may yet succeed. WPCA cannot be reinstated. Its assets are gone, the stock has been repurchased, past and prospective borrowers have lost confidence due in large measure to the actions of defendants.

Plaintiffs brought this action to complain of a faulty audit of the WPCA. They subsequently agreed that the WPCA was insolvent and agreed to enter into voluntary liquidation. Plaintiffs have not shown that they were fraudulently induced to enter into the settlement agreement, that it was a result of excusable neglect on their part, nor that the settlement agreement has been substantially violated by the defendants. The judgment of dismissal is reinstated and the preliminary injunction issued December 21, 1984 will terminate January 2, 1985 at 5:00 P.M.

APPENDIX I

IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT
OF OREGON

GEORGE VanLEEUWEN, HERBERT C.
COLEMAN, WILLIAM A. KESSI, ED
AMMON, and FRED KASER, Plaintiffs,

vs.

THE FARM CREDIT ADMINISTRATION;
DONALD J. WILKINSON; THE
FEDERAL INTERMEDIATE CREDIT BANK OF SPOKANE, WASHINGTON; LARRY K. BUTTERFIELD; TWELFTH FARM CREDIT
DISTRICT; and RONALD BOKMA,
Defendants.

Civil Action No. CV 83–1413 PA

May 15, 1984

Stipulation and Agreement of Dismissal

The parties, by and through their undersigned counsel, hereby stipulate and agree as follows:

WHEREAS—

1. A lawsuit is pending between the parties in the United States District Court for the District of Oregon; and

2. The parties are desirous of settling the matters in dispute and terminating the lawsuit; and

3. The Farm Credit Administration has completed a second examination of the Willamette Production Credit Association ("WPCA"); and

4. The examination procedures and documentation used in that Farm Credit Administration examination were adequate; and

5. The WPCA is in default and insolvent; and

6. Based on the results of that examination the Farm Credit Administration has the authority to declare the WPCA insolvent, place the WPCA into involuntary liquidation, and appoint a receiver; and

7. In recognition of the foregoing, the board of directors of the WPCA has requested the Governor of the Farm Credit Administration to approve the board's resolution to place the WPCA in voluntary liquidation in accord with the terms of said resolution, with the exception of Item #2 thereof; and

8. The Farm Credit Administration will approve the charter of a new production credit association in accordance with the terms and requests stipulated in the attached memorandum of Governor Donald E. Wilkinson, dated May 4, 1984, to All Incorporators of the Western Oregon Production Credit Association;

WHEREFORE, the parties agree that the above-captioned action is dismissed with prejudice and each party will bear its own costs and attorneys' fees.

RESOLUTION

RESOLUTION of a meeting of the Board of Directors of the Willamette Production Credit Association held on the 8th day of March, 1984;

WHEREAS, the authority of the Board of Directors of the Willamette Production Credit Association (WPCA) was removed by the Farm Credit Administration on August 10, 1983, under authority granted by Section 1140 of Farm Credit Regulations; and

WHEREAS, the Board of Directors of the WPCA was reinstated on October 26, 1983 by the order of Judge Owen M. Panner, United States District Court, District of Oregon; and

WHEREAS, since the reinstatement, the Board has worked with the Federal Intermediate Credit Bank of Spokane (FICB) and the Farm Credit Administration (FCA) to determine the financial status of the WPCA; and

WHEREAS, it now appears that due to certain factors WPCA as it currently exists cannot provide as advantageous credit services to its membership as could be provided by another alternative; and

WHEREAS, the Board, working jointly with the FICB, has explored all alternatives available to the WPCA as well as to the FICB; Now therefore,

IT IS HEREBY THE RESOLUTION of the Board of the WPCA that it is in the best interest of the shareholders of the WPCA to voluntarily liquidate the WPCA pursuant to Section 1130 of Farm Credit Regulations subject to the satisfaction of the following conditions by the FICB and the FCA:

1. That a new production credit association will be formed to serve the same territory as WPCA, said new production credit association to offer financing and services to eligible farmers in the territory served; as provided by applicable laws and regulations.

2. That WPCA will not be placed in voluntary liquidation status by the FICB until the new PCA's charter has been issued by the Governor of FCA.

3. Members of WPCA who transfer their agricultural loans to the new PCA or their aquatic loans to Northwest Livestock PCA will have the proceeds from their WPCA B stock redemption credited at par value against their B stock investment requirement in the new association or Northwest Livestock PCA.

   B stock redemption credits on WPCA paid off loans will be paid to members at par value.

   Class A stock of WPCA will be retired at par value.

   All other member B stock and participation certificates will be processed at par value under WPCA's membership and general financing agreement and the laws and regulations governing WPCA in Liquidation.

4. The Governor of the Farm Credit Administration will repeal FCA's recent action expanding the territory of Central Oregon Production Credit Association to include the territory which is presently served by WPCA and will be served by the new PCA.

5. FICB will appoint a liquidating agent and WPCA will be liquidated under the Bank's regular plan of liquidation. The liquidating agent will sell all of WPCA's Class 1 and 2 agricultural loans to the newly chartered PCA subject to its approval and will sell all of its Class 1 and 2 aquatic loans to Northwest Livestock PCA subject to its approval.

The major objectives of the liquidation plan are as follows:

a. To resolve the liquidation process on a timely basis, to maximize the return from the association's assets and minimize losses to its creditors.

b. To focus both on the collection and/or improvement, which will allow collection or reclassification, of nonperforming loans that are the most costly assets of the association.

c. To safeguard against a "fire sale" approach to liquidation but rather to encourage timely, reasonable liquidation.

To the extent deemed necessary by the liquidating agent, he may call upon the WPCA Board of Directors for advice and counsel to attain the objectives set forth above. The liquidating agent will provide the WPCA Board with the regular reports relating to the progress of the liquidation.

These aforementioned conditions are mutually dependent on one another, and without compliance with all of them this resolution shall be of no force or effect.

This resolution has been adopted by the Board of Directors of the WPCA in furtherance of the best interest of its members.

/s/George Van Leeuwen
George Van Leeuwen

/s/Ed N. Ammon
Ed N. Ammon

/s/Herbert C. Coleman
Herbert C. Coleman

/s/William A. Kessi
William A. Kessi

/s/Fred Kaser
Fred Kaser

**Memorandum**

May 4, 1984

To: All Incorporators

Western Oregon Production Credit Association

From: Donald E. Wilkinson

Governor

Subject: Application for a Charter for the Western Oregon Production Credit Association

The Farm Credit Administration has analyzed the application to charter a new production credit association to serve the territory currently served by the Willamette Production Credit Association. In analyzing any application, three factors are of primary importance:

1. The association currently serving the territory of the proposed association is analyzed to determine whether the existing association is serving the territory effectively.

2. The directors of the proposed association have demonstrated sound financial management and business judgment in the operation of their own business and/or through other business affiliations.

3. The operating plan submitted by the applicants offers some prospect that the newly chartered association can be successful.

Considering those three main factors in your application, we find:

1. Several of the proposed board members have loans with the Willamette PCA that are classified less than acceptable. The adverse loan classification identifies loans that have serious credit weaknesses that require more than normal servicing. The classification evidences that the borrower is experiencing problems in his agricultural operations that reflect negatively on the borrower's practices. In addition, since the loan quality has deteriorated, the borrower's impartiality and objectivity in the decisionmaking process of the board is in question. For these reasons, no charter request can be approved that contains proposed directors with adversely classified loans. In addition, two of the present directors of the Willamette PCA are proposed as directors of the Western Oregon PCA. The financial condition of the Willamette PCA has been in decline since 1980. The board was not successful in assuring that necessary corrective actions were made, as evidenced by the current default and insolvency of the Willamette PCA. Therefore, members of the Willamette PCA board cannot serve as directors of the Western Oregon PCA.

2. The proposed territory is currently served by the Willamette PCA. A new PCA cannot be chartered to serve this territory until the Willamette PCA is placed in liquidation through voluntary liquidation or receivership. The liquidation of the Willamette PCA is necessary in order that the new PCA be provided with sufficient loan volume (in the form of acceptable loans acquired from the Willamette PCA in receivership) to provide the new PCA with reasonable prospects for survival.

3. The operating plan proposes joint staff between the Western Oregon PCA and the Willamette PCA. While such an arrangement may be necessary for a short interim period, it must not continue beyond a certain date because the activities and responsibilities of the employees of the two entities are distinct and must be kept separate.

The Farm Credit Administration will give favorable consideration to an application to issue a charter to the Western Oregon PCA if the application is amended as follows:

1. The proposed membership of the board must be brought into conformity with the following requirements: each proposed director who is a borrower of the Willamette PCA must have a loan that is classified "Acceptable"; and no proposed director can

▇▇▇▇▇▇▇ be a member of the present Willamette PCA Board of Directors.

2. The agreement between the proposed association and the Willamette PCA to maintain some joint staff must have a termination date of no later than 6 months following the issuance of a charter for the Western Oregon PCA. After that date, no joint employees will be maintained. The charter will be issued when the WPCA is placed in liquidation.

FCA is prepared to charter the Western Oregon PCA on the bases outlined above, but the following reservations must be noted and recognized by the incorporators. The proposed association offers significant disadvantages over an earlier proposal (Central Oregon) to provide credit service to the territory currently served by the Willamette PCA. The proposed association will charge a higher interest rate. Service will not be as good due to fewer branches and the operation of the participation pool that currently accepts only acceptable loans and well-secured problem loans only after making its own independent credit decision. Finally, the association will have no initial capacity to absorb credit risks. In spite of these disadvantages, the incorporators desire a separate association serving the Willamette Valley. Therefore, if the above conditions are met, a charter will be issued for the Western Oregon PCA.

It is FCA's obligation to assure, to the extent possible, that the incorporators of the proposed association have as many facts at hand as possible to assist them in making a decision. FCA is not able to take into consideration any intangible differences inherent in dissimilar agricultural areas, so its evaluation of any alternative proposals is limited only to financial factors. FCA, however, does encourage the incorporators to actively indentify and consider all factors impacting on alternatives.

The agency considered the last proposal presented by Central Oregon as an economic alternative. The analysis makes the assumption that Central Oregon's most recent proposal would still be in effect, although, no contact has been made with Central Oregon to determine this. The Central Oregon PCA could reject or alter any proposal placed before it. With this as a basis, FCA proceeded to make an analysis of the proposal presented in 1983 by Central Oregon, updated with Central Oregon's 5 year financial projection current as of late 1983 and based on their March 31, 1984 balance sheet.

The current FCA analysis of the Central Oregon proposal, if now implemented, shows net savings to the borrower over the new charter proposal of 0.4 percent in interest costs. In its original proposal, Central Oregon would have accepted Willamette PCA's class 1 and 2 loans with a provision that Central Oregon would have up to 120 days to inspect the Willamette PCA loans and reject those not meeting Central Oregon's credit standards. Central Oregon proposed an interest spread of 1.00 percent over the lending rate to its own borrowers. Using Central Oregon's current spread to its own borrowers of 0.6 percent would mean a spread of 1.6 percent to the Willamette members. This is compared with the new Western Oregon PCA, which proposes a 2 percent spread. Additionally, if arrangements were made with Central Oregon for its purchase of the loans on the same basis as is contained in the Western Oregon proposal, i.e., that the loans would be participated in the pool loan program on a 90 percent basis, the interest rate that the Willamette area borrowers would pay would still be 0.4 percent below the interest rate proposed to be charged by the Western Oregon PCA.

The FCA projection of the Western Oregon PCA indicates that the proposed PCA will generate only $81,000 in risk funds by the end of 1984 and $564,000 by the end of 1988. (This projection assumes no loan losses for 5 years.)

The Central Oregon proposal would have resulted in over $6 million in risk funds at the end of 1984 and approximately $9.5 million at the end of 1988. This would be a financially strong PCA.

FCA's study on the viability of the proposed Western Oregon PCA indicates it has a chance of success if the assumptions on growth and loan losses are correct. However, it is estimated that it will take longer than 5 years before the proposed PCA can consider reducing its dependency on the district pool and begin normal lending operations.

### Farm Credit Administration
May 4, 1984

Mr. George Van Leeuwen, Chairman

Board of Directors

Willamette Production Credit Association

P.O. Box 590

Salem, OR 97308

Dear Mr. Leeuwen:

The November 25, 1983 credit examination of the Willamette Production Credit Association has been completed. The results of this examination are summarized in the enclosed report.

After the adjustments reflecting the results of the examination are made to the association's financial statements, the following significant facts are evident:

1.  The association's capital stock is impaired.

2.  The association is in default on its loan from the Federal intermediate credit bank and is insolvent.

3.  If the association resumes its program of retiring capital stock and participation certificates in excess of the amount needed to capitalize a borrower's loan, the association's debt-to-capital ratio will exceed the 10 to 1 limit permitted by law.

In recognition of these facts, the board has requested that the Governor of the Farm Credit Administration approve the board's resolution to place the association in voluntary liquidation.

As you are aware, the lawsuit, *Van Leeuwen, et al., v. Farm Credit Administration et al.,* is pending in United States District Court, District of Oregon. Currently, the Farm Credit Administration is under a restraining order that prevents the Agency from approving the request to place the association in voluntary liquidation. The court has scheduled a trial date of May 16, 1984. FCA intends to file a motion for a summary judgment by May 18, 1984, and will request that the trial date be delayed pending a decision on that motion.

If the new association is chartered, borrowers from the Willamette PCA whose loans are classified "Acceptable" or any other borrower accepted by Western Oregon PCA may voluntarily become members of the new association. This action must be evidenced by each borrower's executing a membership agreement with the Western Oregon PCA. This agreement must provide the borrower with an explanation of his/her rights and liabilities as a borrower/stockholder of the Western Oregon PCA. Prior to becoming stockholders and executing a membership agreement, all prospective stockholders shall be given a pro forma financial statement of the Western Oregon PCA.

This statement can be prepared on the assumption that Willamette PCA loans classified "Acceptable" will be transferred to the new production credit association. The statement will be footnoted in explain the assumptions used in its preparation. Thereafter, borrowers shall be provided financial statements of the association at least semiannually.

The lawsuit can only be terminated by a dismissal or by the court's entering a judgment. FCA is prepared to move to a judgment but will agree to a dismissal of the action with prejudice against the plaintiffs. In connection with the dismissal, FCA will approve the action of the board to place the Willamette PCA in voluntary liquidation.

Sincerely,

/s/Donald E. Wilkinson

Donald E. Wilkinson
Governor

Enclosure

IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT
OF OREGON

GEORGE VanLEEUWEN, HERBERT C.
COLEMAN, WILLIAM A. KESSI, ED
AMMON, and FRED KASER, Plain-
tiffs,

v.

THE FARM CREDIT ADMINISTRATION;
DONALD J. WILKINSON; THE
FEDERAL INTERMEDIATE CRED-
IT BANK OF SPOKANE, WASH-
INGTON; LARRY K. BUTTER-
FIELD; TWELFTH FARM CREDIT
DISTRICT; and RONALD BOKMA,
Defendants.

Civil No. 83–1413–PA

May 15, 1984

ORDER

Based upon the stipulation of the parties
filed herewith, this action is dismissed with
prejudice and each party will bear its own
costs and attorneys' fees.

DATED this 15th day of May, 1984.

/s/Owen M. Panner
Owen M. Panner
United States District Judge

Presented by:

/s/Jack G. Collins
Jack G. Collins, Asst. U.S. Attorney
Attorneys for United States